STATE of Missouri, Respondent,

v.

Timothy DONNELL, Appellant.

No. WD 46988.

Missouri Court of Appeals,
Western District.

Sept. 21, 1993.

Earnest J. CLARK, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 47339.

Missouri Court of Appeals,
Western District.

Sept. 21, 1993.

Before ULRICH, P.J., and BERREY and SMART, JJ.

ORDER

PER CURIAM.

Appeal from the denial of a Rule 24.035 motion for post-conviction relief. Affirmed. Rule 84.16(b).

Donald L. Wolff, Clayton, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Before SPINDEN, P.J., and FENNER and HANNA, JJ.

HANNA, Judge.

This is an appeal from convictions for three counts of sodomy (§ 566.060, RSMo 1986) and one count of robbery in the second degree (§ 569.030, RSMo 1986) returned in the Circuit Court of Boone County. The defendant was sentenced in accordance with the jury verdict to sentences of ten years, twenty-two years, twenty-four years and seven years, respectively. The sentences were ordered to run consecutively.

The evidence, stated in the light most favorable to the verdicts, showed that the victim and her husband owned a garden center on Peachtree, south of Columbia in Boone County. While the victim was working at the garden center on October 28, 1991, her husband called on the telephone. Telephone records show that the call lasted from 1:28 p.m. to 1:30 p.m. While the victim was on the phone, the defendant walked into the greenhouse. The victim hung up the telephone and asked the defendant if he needed help, which he declined. Eventually the defendant asked the victim questions concerning ground cover. As the victim was looking through a book for pictures and answers to his questions, the defendant punched her in the nose and knocked her to the ground.

The victim screamed and the defendant put his hand over her mouth, at which time she bit a couple of the defendants fingers. She thought she may have bitten the defendants fingers hard enough to cause them to bleed. The defendant threatened to kill the victim and asked where the money was kept. She identified the cash box on the counter. He took money from the cash box and asked for the money in her purse. There was none.

The defendant led the victim around as he looked for customers on the grounds. The victim noticed a tan vehicle parked behind a pile of mulch behind the greenhouse. Just slightly more than a passenger window of the vehicle was visible.

The defendant said, "Do it." He unzipped his trousers, forced the victim to get down on her knees and forced her to perform an act of fellatio. He then ordered the victim to unzip her pants and when she did, he stuck his finger in her vagina. He continually threatened to kill the victim. He forced the victim to kneel down and again perform an act of fellatio. The defendant ejaculated in the victim's mouth and he indicated he would kill her if she did not swallow. After she swallowed the ejaculate, the defendant made the victim look up at him and said, "I know what your face looks like. If you tell anyone or the police, I'll come back and kill you. I know what you look like."

The defendant made the victim lie on her stomach and he put five or six large potted plants on top of her. She waited about five minutes after he left and then ran to a nearby carwash. Two individuals from the carwash took her to University Hospital. She arrived at the hospital at about 1:52 p.m. and she explained what had happened to her. Examination revealed bruises across the bridge of her nose, on the upper part of her abdomen, and on her knees. She also had abrasions on her knees. No semen was found in her mouth but this was described as not unusual.

At the hospital, the victim spoke to a Columbia police officer and described her assailant as a black male, about 5′11″ tall, 170–180 pounds, medium build, in his late 20s and wearing a blue windbreaker and black jeans. She further described him as having black curly hair and two damaged front teeth, one of which was chipped and the other, gray.

Officer Susan Wooderson of the Columbia Police Department was dispatched to the hospital and took the victim to the police station. She took a statement from the victim and tried to construct a composite picture based on the victim's description. However, the composite was never released because the victim was not satisfied with the results.

Officer Wooderson determined that the defendant was a suspect and contacted his superior at the Columbia Public School System. She asked for a recent photograph of the defendant and photographs of other individuals working for the school system who had the same general appearance as defendant. Those photographs were received and constituted the photographic lineup.

The following day, the victim viewed the photographic array and immediately identified the defendant's photograph. She was 100% certain of her identification. She noted that she did not recall her assailant as having facial hair, but that the photograph looked just like him.

The victim was told that the defendant worked for the school system but was not told that he was a driver. The victim knew that the school system owned two vehicles which frequently drove by the garden center and that one of those vehicles was a tan van. She remembered that the driver of the van, whom she had seen from a distance of about seventy-five feet, looked like her assailant and often stared at her when he drove past her place of business. She had seen him on about twenty different occasions.

The next day, Officer Wooderson and her supervisor went to the defendant's place of employment and contacted the defendant. The defendant accompanied them to the police station where he was advised of his rights.

When the defendant was informed that a woman had been robbed and assaulted in the south part of town two days ago, he denied that he had been in that area at that time. The defendant was told he fit the description of the assailant, to which he replied that it could not have been him because he always wore a red baseball cap with Sixers on the front of it. Officer Wooderson inquired as to the clothing he wore on the day of the assaults. He said he wore a blue jacket that zipped up the front, a pair of black pants, a gray jersey shirt and a pair of tennis shoes. A search of the defendants residence revealed a blue jacket made of poplin material, a blue jacket made from sweatshirt material and a pair of black jeans.

Wooderson saw a puncture wound on the middle finger of the defendant's left hand. He described this as a wound that occurred Monday (the day of the assaults) on a hook on the inside of the door of the van that he used to make deliveries. The wound was photographed. That afternoon a dentist was brought in to make a cast of the wound. However, the wound had been altered in that the skin had been torn back and signs of abrasions were present. The wound was again photographed. The dentist was unable to state conclusively that the wound was a bite mark, but determined that it could have been caused by a tooth when the finger was yanked out of a mouth.

The defendant told the officers he had left the maintenance building at about noon and returned about 2:30 p.m. He said he had not been in the south part of town and he listed seven places he had stopped to make deliveries or pickups that day. However, the evidence showed that the defendant made only four of the claimed stops on the day of the crimes. The defendant was sighted at various places just south of the scene on the day of the crimes by a maintenance supervisor who worked with the defendant.

Approximately seven months after the crimes, Officer Haws of the Columbia Police Department attempted to recreate the delivery runs the defendant described. He made arrangements with another delivery driver for the school district to drive the van used by the defendant while the officer rode along

and kept records. At all the stops, the driver went in and made contact with a customer, as he normally would. He made deliveries and simulated deliveries. The recreated route that the defendant said he took, plus a stop at the garden center, took one hour and twenty-eight minutes.

A few days later, the driver and Officer Haws did the same thing. This time, however, they only went to the four stops that they had confirmed that the defendant visited on the day of the crimes. They left the maintenance building at 12:17 p.m. and arrived back at the maintenance building at 1:27 p.m.

■ In his first point, the defendant claims the trial court committed plain error when it overruled the defendant's motion to suppress the identification evidence and allowed it to be presented to the jury. A motion to suppress was heard pre-trial and overruled. The defendant, however, did not object to the in-court identification. The motions to suppress preserved nothing for review. *State v. Purlee,* 839 S.W.2d 584, 592 (Mo. banc 1992). Therefore, we will review the claimed error pursuant to Rule 30.20 and determine whether the identification evidence was error resulting in manifest injustice or miscarriage of justice.

■ The trial court has broad discretion in determining the admissibility of evidence. *State v. Clark,* 711 S.W.2d 928, 932 (Mo.App. 1986). When reviewing the trial court's refusal to suppress an in-court identification, we consider all facts and reasonable inferences arising therefrom as stated favorably to the admission of the in-court identification. *State v. Blair,* 691 S.W.2d 259, 260 (Mo. banc 1985), *cert. denied,* 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). We are free to disregard contrary evidence and inferences and we are to affirm the trial court's ruling on a motion to suppress if the evidence is sufficient to sustain its findings. *Id.* Identification testimony will be excluded only when the procedure is so suggestive that it gives rise to a "very substantial likelihood of irreparable misidentification." *State v. Hornbuckle,* 769 S.W.2d 89, 93 (Mo. banc 1989).

Our inquiry, therefore, is whether the pretrial identification was impermissibly sugges-

tive, and if so, what impact the suggestive procedure had upon the reliability of the identification. *Id.* The defendant's primary complaint is that in the photo lineup presented to the victim, the defendant was the only one with chipped teeth, which was a primary factor in the identification by the victim. In the other three photographs, the individuals had their mouths closed. However, the photographs are small and it is difficult to see whether the defendant had bad front teeth. The victim said she could not tell from the photograph whether the individual had a chipped tooth and a gray tooth. She did not rely on the teeth in the photograph to make the identification.

■ The lineup is not required to obscure the defendant's distinguishing features. *State v. Carter,* 691 S.W.2d 417, 418 (Mo.App. 1985). "Differences in age, weight, height, hairstyle and other physical characteristics do not . . . compel a finding of impermissible suggestiveness," *State v. Cooper,* 708 S.W.2d 299, 305 (Mo.App.1986), nor do differences in the photographs themselves. *State v. Simms,* 810 S.W.2d 577, 582 (Mo.App.1991). This photo array was not impermissibly suggestive. Nevertheless, having made this finding we will evaluate the reliability of the in-court identification.

■ Reliability is the linchpin in determining the admissibility of identification testimony following a suggestive or tainted photographic lineup. *State v. Higgins,* 592 S.W.2d 151, 160 (Mo. banc 1979), *cert. denied,* 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980). There are various factors to be considered in assessing the reliability of the in-court identification: 1) the opportunity of the witness to view the defendant at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the defendant; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation. *Hornbuckle,* 769 S.W.2d at 93.

■ Considering the factors listed, the following facts are clear. The victim and the defendant were in close proximity in the greenhouse during the middle of the day for

a period of time which was sufficient for the defendant to shop for ground cover and to commit the crimes charged. The victim had seen the defendant on about twenty previous occasions when he drove past the greenhouse in the school systems tan van and stared at the victim. There was nothing to distract the victim's attention from the defendant. The victim gave an accurate description of the defendant to the police and she correctly described his wearing apparel on the day of the crimes. She accurately described his defective teeth. There was also the evidence she bit the defendant on the fingers hard enough, she believed, to draw blood. The victim displayed no uncertainty in identifying the defendant as her assailant. Finally, the time period between the identification and the crime was about one day.

Irrespective of whether the lineup was unduly suggestive, the victim had an independent and reliable basis for her identification of the defendant. There was no error in the court's ruling, and therefore, no manifest injustice occurred. The lineup was within constitutional bounds. Point denied.

The defendant next complains that the court committed plain error when it sustained the state's motion in limine to prevent Dr. Alvin Goldstein from testifying as an expert on the reliability of cross-racial identification and on the psychological factors that allegedly affect the reliability of eyewitness identifications.

A ruling in limine is interlocutory in nature and is subject to change in the course of a trial. *Purlee*, 839 S.W.2d at 592. The court's ruling sustaining a motion in limine preserves nothing for appeal. *Id.* The defendants claim on appeal is directed toward the trial courts interlocutory ruling rather than the exclusion of the evidence at trial. There is no indication that the defendant attempted to offer the evidence in question during the presentation of defense evidence. Therefore, we review under the plain error standard.

In *State v. Lawhorn*, 762 S.W.2d 820 (Mo. banc 1988), Dr. Goldstein was the proffered expert on the subject of the reliability of eyewitness identification. The court noted that "[t]his case squarely presents the issue whether the defendant in a criminal case is entitled to present expert opinion testimony on the reliability of eyewitness identification." *Id.* at 822. The court held:

> Almost uniformly, state and federal courts have upheld the trial courts exercise of discretion to exclude expert testimony on eyewitness identification, primarily on the ground that jurors may rely on their own experience to reach a judgment on what weight to be given eyewitness evidence.

*Id.* at 823 (citations omitted); *see also State v. Whitmill*, 780 S.W.2d 45, 47 (Mo. banc 1989) (excluding Goldstein as an expert on the same); *State v. Simpson*, 793 S.W.2d 182, 186 (Mo.App.1990) (again excluding Goldstein's testimony). In *Whitmill*, he was called upon to testify to psychological factors, such as stress, anger and fear, which in his opinion, impair reliable identification by witnesses. These are matters which were within the general knowledge of the juror. There was no error, plain or otherwise.

The defendant's third point charges that the trial court committed plain error when it sustained the state's motion in limine to prevent the defendant from calling one Lori Thweat who would have testified that an exhibitionist who looked like the composite drawing was at large while the defendant was in custody. Ms. Thweat would have testified that at 8:00 a.m. on May 26, 1992, in downtown Columbia, a man exposed himself to her. She did not know who that person was, but he resembled the composite picture made by Officer Wooderson in the case at bar. This particular composite picture was never released because the victim in this case did not believe it accurately depicted her assailant.

Evidence which has no effect other than to cause bare suspicion on another is not admissible. *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). The evidence "must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person." *State v. Stokes*, 638 S.W.2d 715, 723

(Mo. banc 1982), *cert. denied*, 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983).

■ Ms. Thweat's proffered testimony did not tend to prove that someone other than the defendant committed the acts of sodomy and robbery against the victim. It showed only that an exhibitionist (not a person who commits crimes of sodomy) was located in downtown Columbia, and that the exhibitionist appeared to look like the composite picture drawing which did not look like the defendant. Again, no error occurred. Therefore, there was no manifest injustice or miscarriage of justice. Point denied.

■ In the defendants fourth point, he claims error of the trial courts ruling which allowed Officer Haws to testify as to how long it took him and a driver from the Columbia school system to cover the route which defendant claims he took on the day of the crimes. The defendant argues that the conditions were not the same because Officer Haws covered the route after school break was in effect.

The state's reenactment was designed to prove that it was possible for the defendant to make the stops he claimed to have made and still have time to commit the offenses in question. The defendant stated that he made the seven stops in about 2½ hours, while Officer Haws testimony showed that it was possible for those stops and a stop at the crime scene to be accomplished in less than 1½ hours.

"Results of experiments made out of court are admissible in the discretion of the trial court if it is shown that the experiments were conducted under conditions substantially similar in essential particulars to the conditions prevailing at the time of the occurrence in suit." *State v. Starr*, 676 S.W.2d 311, 314 (Mo.App.1984). "[T]he degree of similarity or difference should be judged in the light of the fundamental principle that any fact should be admissible which logically tends to aid the trier in determination of the issue." *Blevins v. Cushman Motors*, 551 S.W.2d 602, 610 (Mo. banc 1977).

Haws demonstration occurred under conditions close to those which existed at the time of the crimes. The defendant was free to cross-examine the police officer about possible differences in the conditions which existed and to argue the differences to the jury. *Starr*, 676 S.W.2d at 314. Point denied.

■ The defendants fifth point claims that the defendants motion for judgment of acquittal at the close of the state's case should have been sustained because there was not sufficient evidence from which a jury could have found the defendant guilty. Defendant waived this point when he presented evidence on his own behalf after the state rested. *Purlee*, 839 S.W.2d at 587.

In point six, defendant claims that the trial court erred when it denied his motion for judgment of acquittal at the close of all the evidence. The defendant argues that the state's evidence consisted entirely of the victims identification testimony which "fell short of a credible account of the identity of her assailant." The defendant acknowledges the injury to his finger and the account by his co-worker that the defendant was in the area of the victim's business at the time of the assault.

The defendant details what he believes to be the weakness of the victim's testimony and the inconsistencies of the state's evidence. He also argues that the defendant's evidence clearly defeated the state's case. First, the defendant argues that his fiancee testified to the presence of visible genital warts on the defendant's penis. She further testified that the defendant had facial hair, specifically a beard and moustache, on the date of the crimes. A second witness, Dr. Joe Dean, testified regarding his examination of the defendant and diagnosis that the defendant had genital warts. The victim was forced on two occasions to perform fellatio on her assailant but never noticed the presence of the warts.

The defendant testified not only to the existing condition of the genital warts but also that he frequently used the streets around the victim's business. He testified that he had two chipped front teeth, both equally chipped, and that the wound on his finger was caused by the van door and was on his left hand, not his right hand.

In essence, the defendant is asking this court to weigh the evidence which was adduced at trial. "In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). This court, in its review of the defendant's conviction, must accept as true all evidence, whether direct or circumstantial, tending to prove the defendant's guilt. *State v. Dagley,* 793 S.W.2d 420, 423 (Mo.App.1990). We must also accept all reasonable inferences supporting the verdict, while disregarding all parts of the record contrary to the verdict. *Id.* We do not weigh the evidence. *State v. Villa–Perez,* 835 S.W.2d 897, 900 (Mo. banc 1992).

The evidence was sufficient from which a jury could find the defendant guilty beyond reasonable doubt. First, the victim identified the defendant from a photographic lineup and in court. Her identification was firm and convincing. She described her assailant as an individual wearing a blue windbreaker and black jeans. The defendant confirmed that he wore clothes matching that description on the day of the crime. The victim saw a part of a tan vehicle which was parked behind a pile of mulch at the greenhouse during her ordeal. Evidence showed the defendant had a tan vehicle in his possession at the time of the crime and was observed in that vehicle by a maintenance supervisor who worked with him, near the scene of the crimes about fifteen minutes before they occurred. On numerous occasions during the weeks preceding the crimes, the victim had seen defendant drive by the greenhouse and stare at her. The evidence further showed that while these crimes were being committed, the victim bit a couple of her assailant's fingers, possibly hard enough to cause the individual to bleed because the person kept sticking the hand, which she had bitten, into his mouth. She could not recall which of the individual's hands she bit but thought it was his right hand. Approximately an hour after the crimes were committed, the defendant returned to the maintenance building in the tan vehicle with a puncture wound on the middle finger of his left hand. The defendant claimed that he was injured by the van door, but could not explain how his fingers were positioned when the door hit him, nor could he explain how the door hit his finger.

After the police examined the defendant's wound, he altered the wound in an apparent attempt to conceal his guilt by foiling any possible tests which he may have anticipated that the police would conduct. This is evidence that the defendant was conscious of his guilt. *See State v. Freeman,* 667 S.W.2d 443, 449 (Mo.App.1984). As further evidence of his guilt, the defendant made untrue statements to the police. *See State v. Byrd,* 815 S.W.2d 103, 105 (Mo.App.1991). He denied being near the crime scene even though, as stated above, he had been sighted near the crime scene. He claimed he made seven stops for deliveries or pickups on the day of the crimes. However, the evidence showed he made only four of the claimed stops. When the police officers first confronted the defendant and told him he fit the description which had been given to the police, he responded that he could not be the one who committed the crimes because he always wore a red baseball cap with Sixers on the front of it. The police officers had not told the defendant anything about whether the individual who committed the assaults had been wearing a hat. This indicates that the defendant knew that he had not worn his Sixers hat when he committed these crimes. Additionally, defendant's fiancee testified on his behalf concerning the genital warts. She admitted she had not noticed the condition until she became infected with them.

Sufficient evidence existed for the jury to find beyond a reasonable doubt that the defendant committed the crimes with which he was charged and found guilty. Point denied.

In his final point, the defendant claims the court abused its discretion when it sentenced him to a total of 63 years by running the sentences consecutively because the total sentence was excessive, unreasonable and unrelated to either the offenses themselves or his past criminal history and was based on a biased and inflammatory pre-sentence in-

vestigation report. Defendant argues that the trial court had the discretion to run the three sodomy convictions concurrently with each other with only the robbery charge being run consecutively as mandated by statute. § 558.026.1, RSMo 1986. Defendant cites cases in which similar crimes were committed and the sentences meted out by the jury or court were less severe.

Additionally, the defendant argues that he had previously been arrested for sex related offenses and been acquitted on each of these charges. Nevertheless, those charges were referred to in the pre-sentence investigation report. He admits that he cannot say that the court held these charges against him at the time of the sentencing.

In discussing proportionality of sentencing, the defendant cites to *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). That case was expressly overruled by *Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), in which the Court stated "that *Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee." *Id.* —— U.S. at ——, 111 S.Ct. at 2686.

 When the sentence imposed is within the range prescribed by the statute, it cannot be judged excessive by the appellate court and the consecutive effect of the sentences does not constitute cruel and unusual punishment. *State v. Repp,* 603 S.W.2d 569, 571 (Mo. banc 1980). The crimes committed were serious and the jury verdict confirmed that fact, as did the trial court. Further, the trial court stated that it would not consider the unrelated charges when it sentenced the defendant. We have no reason to believe otherwise. Point denied.

Judgments of conviction and sentences are affirmed.

All concur.